***  FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER  ***

Electronically Filed
Supreme Court
SCWC-17-0000176
16-FEB-2021
07:52 AM
Dkt. 29 OP

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

CAMBRIDGE MANAGEMENT, INC.,
Respondent/Plaintiff-Appellee,

vs.

NICOLE JADAN,
Petitioner/Defendant-Appellant.

_____

SCWC-17-0000176

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-17-0000176; CIVIL NO. 1RC16-1-4118)

FEBRUARY 16, 2021

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND WILSON, JJ., AND
CIRCUIT JUDGE TONAKI, ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I.    INTRODUCTION

The Hawai'i State Judiciary has committed that all litigants who cannot meaningfully access court proceedings based on their English proficiency will be given language access assistance, including the services of a court-appointed

interpreter.  The courtroom setting is often intimidating; its language, technical.  In light of this reality, it is the court's responsibility to determine whether a litigant can speak and understand English such that they are able to <u>meaningfully</u> access justice in this extraordinary setting – not simply whether their English is passable, adequate, or otherwise "good enough" to meet ordinary day-to-day demands.

In the instant case, the Judiciary's language access commitment was not kept.  Specifically, the District Court of the First Circuit (district court) failed to determine whether defendant Nicole Jadan's participation in the court proceedings would be meaningful absent language assistance when it resolved her repeated requests for an interpreter.  We accordingly vacate the judgment with respect to Jadan's counterclaim for damages and remand to the district court, which must give due consideration to her request for the services of an interpreter, for further proceedings.

We also clarify that the meaningful access mandate extends to <u>all</u> proceedings in Hawai'i state courts, including appeal.  We recognize, however, that our rules do not contemplate how to ensure adequate language access on appeal. We therefore refer this matter to the Hawai'i Supreme Court Committee on Court Interpreters and Language Access to determine

what services are necessary and how best to provide those services in the course of the appellate process.

## II.  BACKGROUND

### A.  District Court Proceedings

All told, the district court held nine hearings on respondent Cambridge Management's (Cambridge) complaint and Jadan's counterclaim, presided over by five different judges. Although the record lacks transcripts of the district court proceedings, in light of the issues presented by this case and pursuant to Hawaiʻi Court Records Rules Rule 4[1] and our authority under Hawaiʻi Rules of Appellate Procedure (HRAP) Rules 11(b)(3)[2] and 10(e)(2),[3] this court ordered that the audio and video recordings of the proceedings below be transmitted.[4] We have reviewed those recordings, and we observe that at eight of those

---

[1]     Hawaiʻi Court Records Rules Rule 4 provides that "[t]he record of each case . . . shall include . . . (d) . . . audio or video recordings of court proceedings[.]"

[2]     HRAP Rule 11(b)(3) provides in relevant part: "Physical exhibits other than documents, and such other parts of the record shall not be transmitted by the clerk of the court or agency appealed from unless he or she is directed to do so by appellate court order."

[3]     HRAP Rule 10(e)(2) provides in relevant part: "If anything material to any party is omitted from the record by error or accident or is misstated therein, corrections or modifications may be as follows: . . . (C) by direction of the appellate court before which the case is pending, on proper suggestion or its own initiative."

[4]     Cambridge urges this court not to rely on the audio and video recordings of the proceedings. However, Hawaiʻi court rules contemplate that the appellate courts may order parts of the record that were not previously transmitted. We chose to exercise that authority under the exceptional circumstances presented by this case.

court dates, Jadan either requested the assistance of an interpreter – including once by written motion during the short period in which she was represented by counsel – or indicated to the court that she struggled with understanding and communicating in English.  These requests were denied all but once.  Even after one judge agreed to appoint an interpreter midway through the district court proceedings, subsequent court dates proceeded without the services of an interpreter.  The following description of the district court proceedings reflects the recordings of the proceedings and the written record on appeal.[5]

Cambridge, the managing agent of the apartment in which Jadan lived, filed a complaint for writ of possession against Jadan on June 21, 2016.  The complaint alleged that Jadan broke her rental agreement because she gave notice she would move out by June 2, 2016, but failed to do so.  With the assistance of the district court's Access to Justice Room, a volunteer-driven program providing free legal advice to pro se litigants, Jadan filed a counterclaim for about $40,000 in damages and an injunction.  She claimed, among other things, that Cambridge had "destroy[ed] medical equipment" in her unit, that her unit was "not fit to be lived in," and that Cambridge

---

[5]     Given that the only issue presented by Jadan's application for certiorari relates to her interpreter requests, we review and describe the record only as it relates to her language access needs.

4

should be enjoined from "interfering with [her] ability to enter into another rental agreement," alleging that Cambridge had been "speaking untruths about [her] ability to pay rent[.]"

The first status hearing was held on July 15, 2016.[6] Immediately after stating her name, she asked the court whether a friend could assist her with English.  The court never resolved this request.  It instead referred the parties to mandatory mediation and, when they returned from mediation unsuccessful, set the case for trial.

The trial regarding the writ of possession occurred on August 5, 2016.[7]  Jadan initially told the court that her interpreter had not arrived, but she would attempt to proceed on her own.  But roughly ten minutes later, she requested the services of an interpreter.  The court asked how long she had been in the United States; Jadan responded that she had been in this country a long time, and the court told her that her English was "pretty good."  Jadan explained that she had been badly injured and that the injury made it difficult for people to understand her; the court did not conclude the injury was grounds for language assistance and denied her request.  The minutes reflect that the request for a Polish interpreter was denied because "[Jadan's] English is fine."

---

[6]     The Honorable Gerald H. Kibe presided.

[7]     The Honorable Ronald A. Albu presided.

The possession trial proceeded.  Numerous times that day, Jadan expressed that she was finding it challenging to translate what she wished to say into English and that interruptions (such as Cambridge's objections) made it difficult for her to communicate.  For example, during cross-examination of one of Cambridge's witnesses, the district court cautioned Jadan that she was wasting time by asking irrelevant questions; Jadan responded that expressing herself in English was proving challenging and that she would be able to better communicate with an interpreter.  As another example, during direct examination of one of her witnesses, Jadan stated that she was ashamed of her poor English.  And one of her witnesses testified that Jadan had difficulty with the English language and that the witness had suggested that Jadan get the services of a translator.

The trial was characterized by the court's repeated admonishments for Jadan to ask relevant questions and avoid using examination as an opportunity to testify.  This dynamic proved frustrating for the court – at one point, the court expressed anger at Jadan for refusing to follow the rules.  At another, the court told her that if she did not cooperate and stop wasting time, it would simply find for the plaintiff.  However, Jadan repeated on several occasions that she was struggling to express herself in English, implying that this

challenge, rather than any dilatory intent, caused her often-lengthy questions and responses.

The court ruled in favor of Cambridge and ordered a writ of possession to issue forthwith. Per the minutes, "[t]he court found that defendant had no legal reason for not moving out."

The parties reconvened for a status hearing on September 30, 2016, at which point Jadan once more asked for an interpreter. She explained to the court that she could speak English, but she could not understand technical terms, and that the assistance of an interpreter would help her more fully express herself in English. The court again asked her how long she had lived in the United States; she again responded that she had been in the country for some time but recently was injured. The court denied her interpreter request, reasoning that she did not have an interpreter during the trial, which was only a few months prior. The minutes state, "[Jadan] speaks English well and manage[d] on her own at the trial[.]"

By the time of an October 21, 2016 status hearing, Jadan had procured counsel.[8] This was the only hearing at which no interpreter request was made.

_____

[8] At the hearing, the court and counsel discussed their pre-existing professional relationship. Counsel accordingly requested Judge Albu's recusal, and Judge Albu recused from the case thereafter.

Through counsel, Jadan moved for appointment of an interpreter on October 31, 2016.  The written motion argued:

> [A] review of the videotape transcript of the [possession trial] make[s] it clear that Defendant was in need of an interpreter.  Defendant's lack of proficiency in the English language should have been apparent to the Court, which indicated that it could not understand Defendant.  In addition, Defendant's lack of proficiency most likely caused the Court to grow impatient with her, which caused Defendant to cry, and which lead to the Court's threat to impose sanctions on Defendant who was trying to ask questions of witnesses and of the Court.[9]
> The Court should have recognized that Defendant was in need of an interpreter, instead of ignoring her requests and her quite obvious non-fluency in English.  This motion seeks to right that injustice.

Cambridge's written opposition argued that the request should be denied because Jadan had already twice asked for, and was twice denied, an interpreter.  Cambridge's counsel attested in a declaration that he had met with Jadan in person in June of 2016; counsel "did not have any trouble understanding Defendant and does not believe Defendant had any trouble understanding [him]."  Cambridge also cited court records indicating that Jadan had been a party in at least six other cases, one of which also involved a denied interpreter request.  Cambridge argued these records indicated she had the "wherewithal" to handle matters such as orally requesting dismissal without language assistance.  And Cambridge responded to the claim that the court had grown "impatient" with Jadan by asserting that any

---

9    This likely refers to the court's statement at the possession trial that Jadan was wasting Cambridge's attorney's time and that attorney's fees could be imposed if she lost, asking her: "Do you want to pay his attorney's fees too?"

impatience was "the result of Defendant's disagreement with the Court's rulings and refusal to move on with the case." Cambridge argued appointment of an interpreter would only cause further delay.

A hearing was held on the motion on December 16, 2016.[10] Jadan's counsel asserted that, in addition to the arguments raised in the written motion, he himself could not understand his client, and he would not have brought the motion if he could.

The court denied the motion, noting that it had presided over a case involving Jadan in the past and had denied an interpreter request in that case, as had prior judges in the instant proceeding. The court also noted that Jadan had been a paid interpreter for the judiciary.[11]

---

[10] The Honorable Thomas A. Haia presided.

[11] Cambridge supported this contention in its memorandum in opposition by reference to the minutes of an August 2014 hearing in one of the six other cases involving Jadan – the case over which Judge Haia also presided, as he referenced at the December 16, 2016 hearing. The minutes of the 2014 hearing, which occurred more than two years prior in an unrelated case, state that "[Jadan] made representation that she was previously a translator for the Judiciary[.]" Jadan briefly mentioned that she once served as an interpreter during the September 30, 2016 hearing before Judge Albu, but it is not clear from the district court record when and under what circumstances this occurred.

Cambridge raised the same assertion in its answering brief at the Intermediate Court of Appeals. In her opening brief, Jadan said that twenty-six years ago, she assisted her son in a case in which he was a party, and in her reply brief, she indicated that this was the occasion to which Cambridge referred. The reply brief asserted that she "was not adequate" in that case, and "[the judge in that case] got the truth of my son by herself without me."

Jadan began to speak while the court announced its ruling.  The court noted for the record that Jadan "just spoke English."  Her counsel, however, responded that the issue was not whether she could simply speak English, but whether she could speak English such that they could effectively communicate with each other.  Nonetheless, the motion was denied.

The parties appeared for a status hearing on January 6, 2017.[12]  Jadan's counsel did not appear.  Although the case was continued, Jadan twice told the court during the hearing that it was a challenge for her to translate her thoughts and express herself in English.

Another status hearing occurred on January 13, 2017.  Jadan expressed dissatisfaction with counsel and told the court she wished to proceed on her own, with the assistance of an interpreter.  Neither Cambridge nor Jadan's counsel objected to her proceeding pro se, although Cambridge objected to the appointment of an interpreter, noting the same request had been denied three times.  The court granted both requests after engaging directly with Jadan to ascertain exactly what assistance she was requesting and why she needed it.

On February 3, 2017, no interpreter appeared; Jadan proceeded on her own.  The court set a trial date for Jadan's

---

[12]     The Honorable Michael K. Tanigawa presided.

counterclaim.  When Jadan asked whether she could get an interpreter for that date, the court responded that it could try, but that trial would proceed on the next date either way because Jadan was able to express herself.  The minutes reflected the same: "The court ordered a Polish interpreter but informed [Jadan] that trial will proceed even if one is unavailable."

The trial for damages on the counterclaim proceeded before a fifth judge on February 17, 2017.[13]  When asked why she thought Cambridge owed her money, Jadan tried to explain to the court that she needed an interpreter, saying that although she spoke English, "legal English" was different, akin to a new language altogether.  A few minutes later, she reiterated this need; the court responded that she had appeared in court many times since the case began.  But Jadan told the court that without an interpreter, what could normally be said in a sentence would take her a paragraph.

Jadan took the stand.  After being sworn in, Jadan once again asked for an interpreter, asking why the previous judge had found that she could not speak the kind of English required by the courtroom.  The court responded that many people proceed pro se, that her English was adequate, and that one does

---

[13]     The Honorable Maura M. Okamoto presided.

not need to be a lawyer to do what Jadan was doing.  Per the minutes: "The court . . . noted . . . Jadan appeared to understand and speak English competently and that per court minutes from 2/3/17 trial could proceed even if a Polish interpreter was unavailable."

Jadan's testimony proceeded.  Multiple times, she exhibited difficulty in communicating.  Later, Cambridge presented a witness; during cross-examination, Jadan again expressed the challenge of formulating a question in English absent an interpreter.  As in the possession trial, Jadan was repeatedly admonished to keep her questions relevant and to avoid testifying while asking them.

The court found for Cambridge and awarded attorney's fees against Jadan.

On February 22, 2017, Jadan moved for reconsideration. Her handwritten motion argued that Judge Tanigawa had ordered the appointment of an interpreter, no language services were ever provided, and the damages trial proceeded without an interpreter over her objections.  The motion was denied.  Jadan appealed thereafter.

B.  **Proceedings on Appeal**

On appeal, Jadan again filed a request for a Polish interpreter.  Her handwritten motion said, "I am 71 years old

and I can not[14] even start to begin with NO interpreter.  There was Court order for Polish interpreter for me ordered by the honorable Judge, but the interpreter didn't show up because there is NO justice."  The Intermediate Court of Appeals (ICA) construed Jadan's filing as a motion for appointment of a Polish interpreter on appeal and denied the request.  It determined that "appointment of an interpreter is not necessary to raising any argument on appeal," and "[b]ased upon consideration of [Jadan]'s motion and the record, we observe no authority for appointment of an interpreter on appeal."  However, the ICA indicated that "a renewed request" could be filed "in the event that the merit panel schedules oral argument."

Jadan, who was relieved of the requirement to pay court filing fees before the district court due to indigency and granted in forma pauperis status for her appeal, also moved for a fee waiver in order to acquire the transcripts she requested. The ICA determined that Jadan had "fail[ed] to demonstrate that she is statutorily exempt from transcript fees" and denied the motion.  It later explained in its summary disposition order that Hawai'i Revised Statutes (HRS) § 802-7 (2014), which provides for the waiver of transcript expenses for certain

---

[14]     Any errors in the quotations from Jadan's briefs included in this opinion are in the original and have been intentionally left given the nature of the issues in this case.

13

criminal defendants, was inapplicable in a civil appeal, and "Jadan remains responsible for providing the appellate court with appropriate transcripts to support her contentions on appeal."

Jadan's handwritten opening brief requested that the award of attorney's fees be "take[n] away" and that the ICA grant her counterclaim.  The brief stated: "It is very difficult for me to express what I want to express information and explanation in American English without interpretor nor translator."  Jadan went on to point out, as relevant here, that one of the five district court judges who heard her case indeed ordered the appointment of an interpreter, but no interpreter was ever appointed.

Cambridge's answering brief argued in response that the absence of transcripts in the record alone warranted affirmance.  Even if the court did proceed to the merits, "[t]he record shows that [Jadan] understands, speaks and writes English well," pointing again to the six other cases in which she appeared upon which Judge Haia had relied; "in one of those cases, she represented she was a [c]ourt translator."[15]  Plus, Cambridge argued, she proceeded through the district court and

---

[15]     See supra note 11.

filed the instant appeal without the assistance of an interpreter.

Jadan's handwritten reply brief reiterated, as relevant here, that she had "plead[ed] for Polish interpreter because [she is] not saying nor understand one half of this what [she] did master in Polish language to the perfection." She argued that she told the court that, besides her limited English, she was in "tormenting pain," and a jaw injury impeded her ability to speak.

The ICA affirmed. It noted the conflicting rulings with respect to her interpreter requests, but concluded that "without the transcripts we are unable to review what examinations (if any) the district court conducted and why or how the district court judges arrived at contrary conclusions." It also pointed to the want of evidence in the record "showing that [Jadan] was unable to make herself understood before the district court," relying on the fact that Jadan had "represented herself in two trials and numerous hearings after the district court's finding that she did not require an interpreter."

Represented by counsel, Jadan asked us to resolve one question in her application for writ of certiorari: "Did the ICA commit a grave error of law by failing to recognize that Petitioner, whose first language is Polish, was entitled to the appointment of an interpreter below and on appeal, pursuant to

15

(1) Hawaii Judiciary Policy, (2) this Court's Rules pertaining to the appointment of an interpreter, and (3) the requirements of due process of law?"[16]

### III. STANDARDS OF REVIEW

Interpretation of court rules "is a question of law, which the appellate court reviews de novo."  State v. Metcalfe, 129 Hawai'i 206, 222, 297 P.3d 1062, 1078 (2013) (brackets omitted) (quoting Barcai v. Betwee, 98 Hawai'i 470, 479, 50 P.3d 946, 955 (2002)).

The decision to appoint an interpreter rests within the sound discretion of the trial court.  "An abuse of discretion occurs if the trial court has 'clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.'"  Villaver v. Sylva, 145 Hawai'i 29, 34, 445 P.3d 701, 706 (2019) (quoting Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 114, 839 P.2d 10, 26 (1992)).

---

[16]     We resolve this case based on the application of court rules and therefore decline to reach the issue of due process.

## IV.  DISCUSSION

### A.  The District Court Erred by Failing to Determine Whether Jadan's Access to the Courts Would Be "Meaningful" Absent an Interpreter

Title VI of the Civil Rights Act of 1964 forbids any program receiving federal aid from discriminating on the basis of national origin.  42 U.S.C. § 2000d.  In 2006, the Hawai'i Legislature enacted HRS Chapter 321C, Hawai'i's Language Access Law, to reduce language barriers that inhibit limited English proficient (LEP) persons from meaningful access to services, programs, and activities offered by the State of Hawai'i.  The legislature recognized:

> Many individuals living in Hawaii read, write, speak, and understand English.  There are many individuals, however, who are limited English proficient.  Language for limited English proficient persons can be a barrier to accessing important benefits or services, understanding and exercising important rights, complying with applicable responsibilities, or understanding other information provided by state-funded programs and activities.
>      The purpose of this chapter is to affirmatively address, on account of national origin, the language access needs of limited English proficient persons.

HRS § 321C-1 (Supp. 2012).

The Hawai'i State Judiciary is obligated under this chapter to "take reasonable steps to ensure meaningful access to services, programs, and activities by [LEP] persons[.]" HRS § 321C-3(a) (Supp. 2012).  HRS § 321C-3(b) requires "each state agency . . . [to] provide competent, timely oral language services to limited English proficient persons who seek to access services, programs, or activities."  The Judiciary

17

accordingly set forth a Language Action Plan (LAP) pursuant to its obligations under HRS § 321C-4 (Supp. 2012); the LAP guides judges and judiciary personnel in ensuring access to the courts for people with limited English proficiency.[17]  See Language Access Plan for Persons with Limited English Proficiency, Hawai'i State Judiciary (2017-2018), https://perma.cc/UCJ4-VSMY.

Additionally, the Hawai'i Rules for Certification of Spoken-Language Interpreters (HRCSLI)[18] provide: "All persons involved in proceedings before the Hawai'i State Courts, regardless of literacy or proficiency in the English language, have the right to equal access to the courts and to services and programs provided by the Hawai'i State Courts."  HRCSLI Rule 1.2. Further, "A person who is Limited English Proficient (LEP)

---

[17]    Judiciary Policy #12 provides the guiding framework:

> The Hawai'i State Judiciary is committed to providing meaningful access to court processes and services to persons with limited English proficiency.  In all case types, the Judiciary shall reasonably provide, free of charge, and in a timely manner, competent court interpreters for parties, witnesses and individuals with a substantial interest in a case.  It shall also provide language assistance services at points of contact with the Judiciary, including over-the-counter and over-the-telephone encounters for all Judiciary-related business. The Judiciary shall notify the public of the Judiciary's language assistance commitment.

Language Access Plan for Persons with Limited English Proficiency, Hawai'i State Judiciary, 7 (2017-2018), https://perma.cc/UCJ4-VSMY.

[18]    In March 2019, this court ordered that the previous version of these rules, the Hawai'i Rules for Certification of Spoken and Sign Language Interpreters, be vacated and replaced with the HRCSLI, effective July 2019. This change did not affect the substance of the relevant rules.

18

shall, throughout a legal proceeding, have the right to the assistance of a spoken-language interpreter appointed by the court as provided by court rule." HRCSLI Rule 1.3. The HRCSLI also incorporates as Appendix B the June 22, 1995 "Order Adopting the Policies for Interpreted Proceedings in the Courts of the State of Hawai'i," issued by Chief Justice Ronald Y. Moon. Appendix B provides:

> An interpreter is needed if, upon examination by the court, (1) a party or witness is unable to speak English so as to be understood directly by counsel, court, and jury, or (2) if a party is unable to hear, understand, speak, and/or use English sufficiently to comprehend the proceedings and to assist counsel in the conduct of the case.

HRCSLI Appendix B, § I(A); In re Doe, 99 Hawai'i 522, 535, 57 P.3d 447, 460 (2002) ("To assess whether an interpreter is necessary, trial courts should consider the guidelines adopted by the Chief Justice on June 22, 1995.").

Appendix B, § I(B) further provides that an examination by the court is required "[i]f it appears that a party's or witness' primary language is not English or that a party or witness may not hear, understand, speak and/or use English well enough to fully participate in the proceedings[.]" Such an examination must occur "with or without a motion," and the court must conduct the examination and state its conclusions on the record. HRCSLI Appendix B, § I(B). Appendix B sets forth the following guidance as to the content of the examination:

19

> The examination of a party or witness to determine if an interpreter is needed should usually include questions about the following:
>
> (1) Identification (for example: name, address, birthdate, age, place of birth);
>
> (2) Active vocabulary in vernacular English (for example: "How did you come to court today?" "What kind of work do you do?" "Where did you go to school?" "What was the highest grade you completed?" "Describe what you see in the courtroom." "What have you eaten today?"). Questions should be phrased to avoid "yes-no" replies;
>
> (3) The court proceedings (for example: the nature of the charge or the type of case before the court, the purpose of the proceedings and function of the court, the rights of a party or criminal defendant, and the responsibilities of a witness).

HRCSLI Appendix B, § I(C).

In this case, the district court erred by failing to conduct the examination mandated by the HRCSLI to determine whether Jadan could "speak English so as to be understood directly by counsel, court, and jury," whether she could communicate and speak in English "sufficiently to comprehend the proceedings," and whether she could "understand, speak and/or use English well enough to fully participate in the proceedings[.]" HRCSLI Appendix B, § I(A)-(B).

The district court had multiple opportunities to fully probe Jadan's language access needs, but it repeatedly failed to do so. For example, on the day of the possession trial, Jadan

20

expressly requested an interpreter.[19]  The court's only question before denying the request was how long she had been in the United States.  This sole question failed to resolve whether Jadan could "speak English so as to be understood," "use English sufficiently to comprehend the proceedings," or "understand . . . English well enough to fully participate in the proceedings[.]"  HRCSLI Appendix B, §1(A)-(B).  A person who has lived in the United States their entire life may nonetheless have limited English proficiency such that they require an interpreter in court.[20]

_____

[19]   This was not the first time Jadan asked for an interpreter. During the first status hearing, she asked for assistance as well (and although she asked for her friend to assist, the LAP is unequivocal that the assistance of a lay relative or friend is no substitute for a professional). Rather than consider the request, the court instead referred the parties to mandatory mediation.  When it is court-ordered, mediation constitutes a "court process[]" or "service[]" to which the Judiciary has promised litigants "meaningful access."  Language Access Plan for Persons with Limited English Proficiency, Hawai'i State Judiciary, 7 (2017-2018), https://perma.cc/UCJ4-VSMY; HRCSLI Rule 1.3 (guaranteeing "throughout a legal proceeding, . . . the right to the assistance of a spoken-language interpreter appointed by the court as provided by court rule." (emphasis added)).  It was therefore improper for the court to fail to address Jadan's request before ordering her to participate in mediation.  The court should have, at minimum, ascertained her English proficiency and assessed her language access needs prior to ordering Jadan to mediate.

[20]   Indeed, this question could, in some circumstances, have a chilling effect on access to the courts because it could be perceived as relating to the individual's immigration status.  The American Bar Association's Standards for Language Access in Courts cautions:

> Courts should avoid requesting or compiling individualized information that may inhibit requests for language access services, such as information or documents potentially reflecting immigration status (i.e., green cards, work permits and social security numbers).  This type of information is irrelevant to determine language access needs and potentially erects a barrier to the courts.
>
> (continued . . .)

21

The court also based its denial of an interpreter during the possession trial in part on the fact that it did not consider Jadan's jaw injury relevant to the determination. Injuries or illness are absolutely relevant if they exacerbate communication challenges for LEP persons. The court should not have dismissed the injury as irrelevant; instead, consistent with court rules, it should have probed how and why, if at all, the injury affected her ability to communicate in English.

This pattern continued throughout the proceedings, during which Jadan repeatedly requested language assistance. Even during the brief period in which Jadan had counsel, the court merely inquired into whether Jadan could, in some ordinary sense, speak English – even noting for the record that when Jadan spoke in court, it was in English.[21] As her counsel aptly pointed out, the key question, about which the court was mandated to inquire, is whether Jadan could speak English at a high-enough level to meaningfully access the courts.

Jadan's written motion was resolved in part by reference to past cases in which Jadan was a party, which

---

Standards for Language Access in Courts, American Bar Association, 39 (Feb. 2012), https://perma.cc/MMW9-9KY4.

[21]   It should also be noted our rules provide that appointment of an interpreter is appropriate when "a party . . . is unable to speak English so as to be directly understood by counsel[.]"  HRCSLI Appendix B, § I(A) (emphasis added).  Certainly, counsel's representations that he could not understand and effectively communicate with his own client should have been given due weight under the rules.

occurred years before the instant case began. But the key inquiry is not whether Jadan once spoke proficient English, which is the most that the minutes of past cases could possibly reflect – and even that inference is tenuous at best. Rather, the court is bound to ask whether she now speaks English well enough to give her meaningful access to the court. Language proficiency is not static, so that determination requires the court to probe her English proficiency afresh.

In a similar vein, the ICA pointed to the fact that "Jadan represented herself in two trials and numerous hearings after the district court's finding that she did not require an interpreter." Respectfully, this reasoning is flawed – once her request was denied, it would seem she had little choice but to go it alone. To hold that against her on appeal upends the purpose of appellate review.

In assessing a litigant's language access needs - self-identified or otherwise - no particular colloquy must be performed or checklist met. Our rules provide that the suggested open-ended questions about the specified topics "should usually" be included in an examination, but they do not require them. HRCSLI Appendix B, § I(C). Given that our rule is flexible, we believe it useful to draw from other authorities' approaches toward inquiring into a party's language access needs, which offer additional lines of inquiry that our

courts may find instructive. In particular, the American Bar Association (ABA) adopted Standards for Language Access in Courts in 2012.[22] In addition to some of the questions captured in Appendix B of the HRCSLI, the ABA suggests asking LEP persons: "Please tell me about your country of origin"; "How did you learn English and what is most difficult about communicating in English?"; and "Tell me a little about how comfortable you feel speaking and understanding English." Standards for Language Access in Courts, American Bar Association, 44 (Feb. 2012), https://perma.cc/MMW9-9KY4. We agree with the ABA that these may prove useful inquiries. This case demonstrates as much. Had similar questions been asked of Jadan, she may have been able to communicate what she repeatedly attempted to share with the district court: that she did not feel her English was of a courtroom level; that she struggled to translate her thoughts from Polish to English; and that what would normally take her a sentence to convey in Polish took far longer when she phrased it in English. And armed with those answers, the district court would have been positioned to determine whether

_____

[22] This court has turned to ABA standards as persuasive authority in a variety of contexts. See, e.g., Office of Disciplinary Counsel v. Au, 107 Hawaiʻi 327, 341, 113 P.3d 203, 217 (2005) (attorney discipline); State v. Hussein, 122 Hawaiʻi 495, 504, 229 P.3d 313, 322 (2010) (justification of a criminal sentence); State v. Scalera, 139 Hawaiʻi 453, 461-62, 393 P.3d 1005, 1013-14 (2017) (accused's right to communicate with counsel); State v. Hernane, 145 Hawaiʻi 444, 451, 454 P.3d 385, 392 (2019) (speedy trial).

Jadan's access to the courts would in fact be meaningful without language assistance.

We emphasize that in evaluating a litigant's answer to these questions, the touchstone is whether the person can "be understood directly by counsel, court, and jury," and "understand, speak and/or use English sufficiently to comprehend the proceedings," "to assist counsel in the conduct of the case," and "to fully participate in the proceedings[.]"  HRCSLI Appendix B, § I(A)-(B).  In other words, the court must evaluate the answers to determine whether the litigant's access will be meaningful.[23]

Importantly, a court should conduct its examination on the record, and if it decides in its discretion to deny the request, it should make its reasons clear by expressing why the litigant's English ability enables him or her to be understood, to comprehend the proceedings, to assist counsel, and to fully participate.  HRCSLI Appendix B, § I(B); see also Strook v. Kedinger, 766 N.W.2d 219, 226 (Wis. Ct. App. 2009) ("[O]nce a circuit court has notice of a language difficulty such that the ability to understand testimony or make him or herself understood may be a problem, it has an obligation to make a

_____

[23]    The LAP instructs to assess the speaker's responses for the following: "[i]nappropriate grammar," "[a]wkward vocabulary," "[l]ack of fluency," "[u]nintelligible accents," "[r]epeated statements," or a "[b]lank look."  Language Access Plan for Persons with Limited English Proficiency, Hawai'i State Judiciary, 11 (2017-2018), https://perma.cc/UCJ4-VSMY.

factual determination on the need for an interpreter." (citation omitted)).  Our review of the recordings of the proceedings confirms that the district court's on-the-record findings in response to Jadan's interpreter requests were superficial and insufficient.  The thrust of these findings is reflected in the minutes: The minutes from the August 5, 2016 possession trial reflect that the judge simply found that "[h]er English is fine."  Likewise, the September 30, 2016 status hearing minutes reflect that Jadan "speaks English well[.]"  Concluding that a party's English proficiency is "fine" fails to address his or her English competency in the unique context of the courtroom, where "good" or "fine" language ability may nonetheless fail to afford meaningful access to justice.[24]

The ABA contemplates this misconception - that the ability to merely "speak English" suffices - and explains why a litigant's self-identified language access needs should be given some deference:

> Courts should allow an LEP person to self-identify as needing services.  When an individual or [their] representative requests an interpreter, a judge or adjudicator should presume the need is bona fide.  This preference for self-identification recognizes that assessing language proficiency is a difficult and intensive task that requires training in language acquisition and language proficiency assessment – training not usually possessed by a judge or court personnel.  For example, a judge might be inclined to deny an interpreter for an individual after observing him or her conversing with an

---

[24]    The September 30, 2016 minutes also state that an interpreter was denied because Jadan "manage[d] on her own at the [possession] trial[.]"  During the possession trial, Jadan repeatedly requested language assistance precisely because she self-assessed as struggling to "manage on her own."

attorney without the aid of an interpreter, or after observing the individual following simple instructions such as "sit down."  Such a denial could be erroneous because it incorrectly assumes that the ability to use English for simple communications and rote statements (which are often memorized) is an indication of the language proficiency necessary for the meaningful comprehension and effective communication that is required to protect a person's interest in a legal matter.

Understanding legal proceedings and communications in court settings is particularly challenging to LEP individuals due to a number of factors: the complexity of legal proceedings; the use of specialized terminology; the importance of detailed and accurate information; the lack of familiarity with the legal system in the United States; the stressful and emotional content of the communication; and the impact of court proceedings on a person's life, liberty, family relationships, or property interest.  As a result, many individuals who are comfortable speaking in English in less formal settings require interpreter services and translated written materials in court. Communicating under these circumstances should be done in the language in which the individual is most proficient.

Furthermore, the importance of accuracy in legal proceedings outweighs any concern for abuse of the system in those rare instances where an LEP person appears to be unnecessarily requesting an interpreter.  Legal proceedings can be confusing and intimidating even for an individual who speaks English fluently; the potential for misunderstanding is more acute for one who does not.  In addition to misunderstanding information due to the language barrier, LEP persons from a country where legal systems and concepts vary substantially from those of the United States may be further confused when an interpreter is not used.  The failure to appoint an interpreter when one has been requested not only impairs that person's access to justice but also can result in costs and inefficiencies to the court system in the form of appeals, reversals, and remands.

Standards for Language Access in Courts, American Bar

Association, 41-42 (Feb. 2012), https://perma.cc/MMW9-9KY4

(emphases added) (footnotes omitted).

We agree.  The unique considerations of the courtroom

setting mean that the mere fact a litigant can speak English

passably in everyday life might nonetheless fail to afford her

meaningful access to the courts.  And we reject the notion that

27

a base level of English proficiency alone can suggest that a request for an interpreter is not made in good faith. In our view, the harms of the erroneous denial of an interpreter outweigh the risk that the rare bad faith request will be erroneously granted. This is not to say that the court must grant every request for an interpreter – the court, of course, retains discretion to deny the request if the litigant's English proficiency suffices to afford meaningful access to the courts. But that discretion only lies after the court ascertains the litigant's actual, not assumed, language access needs based on an on-the-record probe.

Jadan's pro se status for most of the district court proceedings also heightened the need for a careful inquiry into whether her access to the court would be meaningful absent an interpreter. During the damages trial, the court told Jadan, in response to yet another request for an interpreter, that her request was denied because litigants proceed pro se frequently and that she did not need a lawyer. But Jadan was not asking for a lawyer, and the comparison is inapt – while she had no right to counsel, she certainly did have a right to an interpreter if she needed one. HRCSLI Rule 1.3.

Indeed, the fact that she did not have a lawyer should have made the court more, not less, sensitive to her language access needs. Cf. Villars v. Villars, 305 P.3d 321, 328 (Alaska

28

2013) ("[W]e encourage trial courts to assess the need for interpreters for pro se litigants even in the absence of any formal request[.]").  A litigant, especially a pro se litigant, as a threshold matter must be able to express why she is in court before a judge can consider the merits of her claim. Thus, just as courts must construe the pleadings of pro se litigants liberally, see Waltrip v. TS Enterprises, Inc., 140 Hawai'i 226, 239, 398 P.3d 815, 828 (2016), courts should consider the request for an interpreter by a pro se litigant even more carefully and resolve doubt in favor of appointment where the court has questions about a pro se litigant's ability to understand and be understood.  "[T]he underpinnings of this tenet" – as with the liberal construction rule – "rest on the promotion of equal access to justice."  Villaver, 145 Hawai'i at 36, 445 P.3d at 708 (brackets omitted); Standards for Language Access in Courts, American Bar Association, 2 (Feb. 2012), https://perma.cc/MMW9-9KY4 ("[L]anguage services are critical to ensure access to justice for LEP persons[.]").  The Nevada Supreme Court recognized this principle in connection with similar proceedings:

> It is apparent that unless the non-English speaking party has an interpreter he is effectively barred from access to the small claims proceeding.  Because small claims court proceedings are informal and involve the spoken language to resolve conflicts between the parties, rather than relying on counsel representation, a particular concern arises when a non-English speaking litigant lacks an interpreter's assistance: "[a]lthough the small claims court functions

29

> successfully without lawyers, pleadings, legal rules of evidence, juries, and formal findings, it cannot function without the use of language." <u>This heightened need for ready and accurate oral communications in small claims proceedings is echoed in other types of cases in which the parties are self-represented</u>.

<u>Caballero v. Seventh Judicial Dist. Court ex rel. Cty. of White Pine</u>, 167 P.3d 415, 420 (Nev. 2007) (emphasis added) (footnotes and citations omitted).

In sum, when a party asks for an interpreter, or if the court has difficulty understanding a litigant's English or otherwise suspects they may need language assistance, the record should reflect that the court has engaged in a meaningful examination into the party's language proficiency by asking open-ended questions designed to assess his or her ability to understand the proceedings and communicate with the court and counsel. Furthermore, the record should include findings about the party's English language proficiency <u>in the context of court proceedings</u>. Courts should not merely evaluate whether a party can speak English; the critical inquiry is whether the party would be able to <u>meaningfully access the court</u> absent an interpreter because their English enables them to understand and be understood by the court and counsel.

In the instant case, the district court abused its discretion by denying Jadan's requests for an interpreter without adequate inquiry into her language access needs. The court's examination - or lack thereof - into Jadan's language

proficiency failed to assess whether Jadan's access would be meaningful without an interpreter.  Cf. Villaver, 145 Hawai'i at 37, 445 P.3d at 709 (failing to consider the factors required by court rule constituted an abuse of discretion).

The proper remedy is the vacatur of the judgment in favor of Cambridge with respect to damages and attorney's fees, and remand for additional proceedings.[25]  The failure to conduct the inquiry our rules prescribe would perhaps be harmless if our review of the record "satisfie[d] us that [Jadan] was able to express [her]self with clearness in the English language and to understand the questions asked."  Cornwell v. Wailuku Sugar Co., 20 Haw. 585, 586 (Haw. Terr. 1911); see also Doe, 99 Hawai'i at 535, 57 P.3d at 460.[26]  In other words, we would leave the judgment undisturbed if, despite the district court's failure to thoroughly probe her language access needs, Jadan nonetheless

---

[25]    This is the only relief Jadan requests on appeal.  We therefore do not address the writ of possession.

[26]    In its supplemental brief, Cambridge urges us to affirm based on Doe, but its reliance on that case is misplaced.  In Doe, we held that a mother in a proceeding affecting her parental rights was not "substantially prejudiced" by the absence of an interpreter for some of the proceedings.  99 Hawai'i at 532, 57 P.3d at 457.  In that case, however, "[s]everal witnesses testified that Mother comprehends and speaks English in daily conversation, and specifically at home."  Id. at 535, 57 P.3d at 460.  Moreover, Mother – who was represented by counsel – "agree[d] to proceed without an interpreter in some instances" and was given the opportunity to request postponement in an interpreter's absence.  Id. at 535, 57 P.3d at 460.
    This case presents markedly different circumstances than Doe.  Here, by contrast, Jadan – who was pro se for the majority of the proceedings – repeatedly requested an interpreter to no avail.  And the record reflects the court failed to even adequately inquire into her language access needs – let alone hear from several witnesses (and it bears repeating, her own counsel claimed he could not communicate with her).

received meaningful access to justice.  But that is not the case.  Based on our review of the nine district court hearings, there were numerous occasions in which Jadan struggled to understand and to be understood.  On this record, it cannot be said that the district court's failure to adequately inquire into Jadan's language access needs was harmless.

**B.   Our Rules Allow for Language Assistance on Appeal**

This case reveals an important gap in the Judiciary's language access provisions.  In light of the disposition of this case, evaluating whether the ICA abused its discretion in denying Jadan's interpreter request on appeal is unnecessary.  However, the ICA, in denying Jadan's request for language assistance, suggested that there is "no authority for appointment of an interpreter on appeal."

We respectfully disagree.  Our rules provide that "[a]ll persons involved in <u>proceedings before the Hawai'i State Courts</u>, regardless of literacy or proficiency in the English language, have the right to equal access to the courts and to services and programs provided by the Hawai'i State Courts." HRCSLI Rule 1.2 (emphasis added).  Rule 1.3 further mandates that "[a] person who is Limited English Proficient (LEP) shall, <u>throughout a legal proceeding</u>, have the right to the assistance of a spoken-language interpreter appointed by the court as provided by court rule."  HRCSLI Rule 1.3 (emphasis added).

Appellate proceedings are self-evidently "proceedings before the Hawaiʻi State Courts" and "legal proceeding[s]," and therefore fall within the ambit of the HRCSLI.

However, our rules are particularly tailored to the context of legal proceedings taking place in a courtroom setting. An examination by the presiding judge must be conducted "on the record" and such an examination is oral and in-person. HRCSLI Appendix B, § I(B)-(C). But appellate judges will rarely have the opportunity to perform such an inquiry given the nature of the appellate process. And although the ICA contemplated an interpreter could perhaps be appointed for oral argument, many cases in our appellate courts are resolved on the briefs without any occasion for in-court argument. At present, the rules do not contemplate the appointment of a translator to assist in the translation of appellate briefs, and the criteria for determining when an interpreter is needed focuses on a party's ability to "speak" English so as to be understood or "hear" English so as to understand the proceedings, rather than, for instance, ability to "write" in English so as to be understood, or "read" English so as to understand as would be more applicable to the appellate process. See HRCSLI Appendix B, § I(A). Moreover, Jadan's application to this court indicates that Jadan requested an interpreter on appeal to help

her understand the rules of appellate procedure,[27] including HRAP Rules 28 and 10, and to help her submit transcripts and appellate briefs in accordance with these rules.[28]  Translated versions of the appellate rules are not available.[29]

Even though an appeal is no doubt a "proceeding[] before the Hawai'i State Courts," HRCSLI Rule 1.2, this court lacks the necessary information to decide whether, when, and how language services should be provided in this new context.  We decline to go farther than clarifying the HRCSLI furnishes authority for the provision of language assistance on appeal. Instead, we find it appropriate to refer this matter to the Hawai'i Supreme Court Committee on Court Interpreters and Language Access to develop standards and best practices to ensure meaningful language access during appellate proceedings.

---

[27]    We note, however, that Rule 9 of the Code of Professional Responsibility for Court Interpreters, to which court interpreters are subject, prohibits an interpreter from giving legal or any other kind of advice to parties.  HRCSLI § 5.1; HRCSLI Appendix B, § III, Rule 9.

[28]    Eligible parties are entitled to over-the-counter language access services that provide meaningful access, which are sometimes provided through a bilingual judiciary employee or through telephonic interpretation services, and a live interpreter may not be required.

[29]    When written translations are not available, sight translation services, whether live, remote, or telephonic, or other methods that provide meaningful language access, could perhaps be considered.  However, it is for the Hawai'i Supreme Court Committee on Court Interpreters and Language Access to develop standards and best practices to ensure meaningful language access during appellate proceedings.

## V. CONCLUSION

For the foregoing reasons, the ICA's May 1, 2019 judgment on appeal is affirmed in part, and vacated in part with respect to Jadan's counterclaim. The district court's March 13, 2017 judgment is vacated, and we remand this case to the district court for proceedings consistent with this opinion.

| | |
|---|---|
| Gary Victor Dubin and Frederick J. Arensmeyer for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Michael A. Glenn for respondent (Richard A. Yanagi on the brief) | /s/ Sabrina S. McKenna |
| | /s/ Michael D. Wilson |
| | /s/ John M. Tonaki |

